IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 11, 2020 Session

**IN RE ESTATE OF ALYS HARRIS LIPSCOMB**

**Appeal from the Probate Court for Shelby County**
**No. PR-1541          Karen D. Webster, Judge**

————————————————————

**No. W2018-01935-COA-R3-CV**

————————————————————

In this appeal of a probate matter, Appellant argues that the trial court erred in ruling that undue influence, breach of fiduciary duty, and conversion occurred as a result of transactions conducted by Appellant as attorney-in-fact of Decedent. Appellant also argues that the trial court erred in ruling that a bank account where both Appellant and Decedent signed a signature card was an individual account instead of a joint account with rights of survivorship. Discerning no reversible error, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

Michael G. Floyd, Memphis, Tennessee, for the appellant, Carnita F. Atwater.

Scott B. Peatross and Jack F. Heflin, Memphis, Tennessee, for the appellee, Scott B. Peatross, Administrator CTA.

**OPINION**

**I.      BACKGROUND**

This case involves probate issues in the Estate of Alys Harris Lipscomb ("the Estate"), which serves as the Plaintiff/Appellee in this matter. Alys Harris Lipscomb, M.D., ("Decedent") died in Shelby County, Tennessee, on May 21, 2014. She was ninety-eight years old. In the years before her death, Defendant/Appellant Carnita F. Atwater ("Appellant") was hired by Decedent to work as her caretaker. Appellant had

previously worked through a third-party as a caretaker for Decedent's previous live-in companion, who died in 2008.

Approximately six months following the death of Decedent's companion, Decedent asked Appellant to work as her caretaker after Decedent was hospitalized after a fall and concerned about being moved away from her home. Appellant initially worked for Decedent part-time. During 2008, Decedent established a revocable living trust, naming herself as trustee, as well as a pour-over will; Decedent appointed her neighbor to serve as her attorney-in-fact through a durable general power of attorney. Decedent also established a bank account for the trust at SunTrust Bank ("the Bank"), account number - 3289. At this time, Decedent's medical condition was deteriorating, according to her long-term doctor, Dr. Vincent Smith ("Dr. Smith"). In 2009, Dr. Smith stated that Decedent struggled to walk or express herself, had stopped taking medication, and was generally tired and weak.

In 2011, Appellant moved into Decedent's Germantown home and became her full-time caretaker and companion. Decedent relied heavily on Appellant's day-to-day care, and Appellant provided constant attention to Decedent's medical and personal needs. Neighbors saw Decedent outside with Appellant and observed that Decedent's appearance and home were cleaner after Appellant moved into the house. Appellant helped feed, bathe, and clothe Decedent and ensured that she took her medications. Over time, the professional relationship between Decedent and Appellant evolved into a close and intimate personal relationship. Both Decedent and Appellant frequently showed their affection for each other while they lived together.

Decedent signed a new will on May 13, 2011, which divided her estate among various charities and personal friends.[1] Under this will, Appellant received approximately 7.5% of Decedent's estate. On or about the time of the will signing, Appellant also revoked her existing trust and pour-over will that she established in 2008.

On October 7, 2011, Decedent signed a Durable General Power of Attorney that designated Appellant as her attorney-in-fact for financial and healthcare matters. The document appointed Appellant to "generally do anything and everything necessary and proper for the furtherance, promotion, and protection of any interest in any business or any investment owned by" Decedent. In the Power of Attorney, Decedent indicated her desire to remain in her home and not be moved to a nursing home or assisted living facility. Nothing in the Power of Attorney documents addressed whether Appellant could provide gifts on Decedent's behalf.

---

[1] As discussed *supra*, Decedent also drafted two documents which purportedly gave her Germantown home and vehicles to Appellant upon Decedent's death. Neither document was admitted to probate, as neither was properly signed and/or witnessed under state law.

On November 22, 2011, Decedent wrote a check in the amount of $320,000.00 from her account ending -8671 to Appellant with the memo line "Happy Baby Birthday with LOVE."[2] In early December 2011, two officers with the Germantown Police Department received a tip regarding the check and conducted a preliminary visit to Decedent's home to investigate the incident. Appellant and Decedent were separated, and Decedent told an officer that she could handle her money how she pleased and that the incident was none of the detective's business. The police department found no basis for further investigation and never filed an offense report about the matter. Appellant and Decedent recorded a hourlong audio conversation about the visit on December 4, 2011. During the conversation, Appellant speculated about who notified the police and denied coercing Decedent into writing the check. Decedent called the matter "ridiculous" and "a bunch of crap." Appellant spoke at length during the conversation about the work she had done for Decedent. In the months following this incident, Decedent's handwriting abilities continued to deteriorate, which led Appellant to write more and more checks on Decedent's behalf.

On June 8, 2012, Decedent and Appellant traveled to the Bank and altered one of Decedent's bank accounts, the account ending in -3289. While there, Decedent attempted to sign the bank's Personal Account Signature Card several times. Appellant signed the signature card as "Carnita Atwater, POA Alys H. Lipscomb[.]" Appellant also signed the Bank's Affidavit of Attorney-in-Fact form. The Bank retained a copy of the Power of Attorney form signed by Decedent. After Decedent's account was altered, Appellant began writing checks on behalf of Decedent and signing them as "Alys H. Lipscomb, Carnita Atwater (POA)." On many occasions, Appellant would sign checks payable to herself on Decedent's behalf. The amounts and purposes of those checks varied from salary, reimbursement for medical supplies, travel expenses, and household items, to personal gifts and "donations" to organizations headed by Decedent. In total, Appellant received $2,305,045.70 through checks she signed on behalf of Decedent through this bank account until Decedent's death.

Starting in July 2012, Dr. Smith began receiving reports of Decedent's declining condition. In July, Appellant contacted Dr. Smith and told him that Decedent was calling out for her parents and not eating. In August, Dr. Smith saw Decedent after Appellant stated that she had instances of memory loss. After a fall in late October, Decedent was taken to see her doctor after she apparently struggled to communicate verbally and was confused and combative at home.

---

[2] The trial court ruled that transfers from Decedent's bank account ending in -8671, including this check, were not the result of undue influence, breach of fiduciary duty, or conversion. Whether undue influence, breach of fiduciary duty, or conversion occurred through this check is not the subject of this appeal.

The checks signed by Appellant as Decedent's attorney-in-fact increased dramatically in number and in value during the last six months of Decedent's life. On September 3, 2013, Appellant wrote a $300,000.00 check as Decedent's attorney-in-fact payable to herself. The memo line stated "Birthday & Love Gift." Two months later, Decedent visited Dr. Smith's office, and Dr. Smith later reported that Decedent experienced memory problems during her visit. On February 14, 2014, Appellant signed a $400,000.00 check as Decedent's attorney-in-fact payable to herself. On the memo line, Appellant wrote "Valentine, Birthday & Bonus (annual)[.]" Shortly after that, Decedent was visited by a family friend who testified that Decedent struggled to remember who he was.

In the final month of Decedent's life, Appellant then wrote and signed a $300,000.00 check as Decedent's attorney-in-fact payable to herself on May 18, 2014. The memo line on the check stated "Love Gift & Living Arrangement[.]" On May 20, 2014, a family friend visited Decedent and found her curled up in a fetal position on a cot and unresponsive to a touch to her foot. Decedent was pronounced dead the following morning. Appellant deposited the final $300,000.00 check in her personal checking account on May 21, 2014, less than four hours after Decedent was pronounced dead.

Following Decedent's death, the Shelby County Probate Court ("the trial court") opened her estate on June 11, 2014 and appointed Scott B. Peatross, in his capacity as Shelby County Public Administrator, as Administrator of the Estate. On July 3, 2014, the Estate filed a complaint against Appellant alleging breach of fiduciary duty, undue influence, conversion, and fraud. In the complaint, the Estate sought a temporary restraining order, a temporary injunction, the creation of a constructive trust, an accounting, and damages against Appellant. In an answer, Appellant denied the claims against her and filed a counter-petition seeking to admit two documents (one hand-written and one typed) as codicils to Decedent's will signed in 2011. The trial court admitted Decedent's will to probate on October 17, 2014, and denied Appellant's efforts to admit the two documents as codicils on October 27, 2015. Appellant filed a notice of appeal regarding the denial of the counter-petition, but this Court dismissed the appeal for lack of subject matter jurisdiction. *See* **In re Estate of Lipscomb**, No. W2015-02277-COA-R3-CV, 2016 WL 4037044 (Tenn. Ct. App. July 25, 2016).[3] In the interim, the Estate was allowed to amend its complaint to expand the period of time in which Appellant allegedly acted improperly. The Estate also added a claim of exploitation of an elderly and/or disabled person under Tennessee Code Annotated section 71-6-120. On October 1, 2015, the Estate filed a petition to hold Appellant in contempt after she listed various items that allegedly belonged to Decedent for sale online as part of a "New

---

[3] The first **In re Estate of Lipscomb** opinion is a memorandum opinion, which means it "shall not be published, and shall not be cited or relied on for any reason in an unrelated case." Tenn. R. App. P. 10. As the present case is related to the previous case, we reference this memorandum opinion solely in a procedural context.

- 4 -

Chicago Community Development Corporation Estate Sale." The trial court did not hold Appellant in contempt, as no sale of Decedent's property ever occurred. Appellant was awarded a partial award of attorney's fees from the Estate for defending the contempt petition. On appeal, this Court reversed the trial court's award of attorney's fees to Appellant. *See In re Estate of Lipscomb*, No. W2016-00881-COA-R3-CV, 2018 WL 3084758 (Tenn. Ct. App. June 21, 2018). Concurrently, Appellant and the Estate moved for summary judgment in this matter, but the trial court orally denied both motions on October 28, 2016.

The parties commenced a nine-day trial on October 31, 2016. After a break that spanned from November until January, the trial concluded on January 26, 2017. During the trial, the Estate called witnesses from the Bank to verify the voluminous bank records admitted into evidence and testify about their interactions with Decedent over the course of approximately eighteen to twenty years. Decedent's friends and colleagues testified to Decedent's medical condition, how her health declined in the final years of her life, and how her life was improved by Appellant's presence. The attorney who drafted Decedent's since-revoked trust and will testified to Decedent's ability to communicate. The deposition of Dr. Smith was admitted as evidence. Three recorded conversations between Decedent and Appellant were also played into evidence.

As part of the Appellant's proof, the Germantown police detective who visited Decedent to question her about the $320,000.00 check she signed testified about the matter. Several neighbors testified that they did not see Decedent suffer from health or cognitive impairments and stated that Decedent's life had improved since Appellant entered her life. Appellant also testified over multiple days about the scope of her relationship with Decedent, the work she performed for Decedent as her caretaker, the checks she signed as Decedent's attorney-in-fact, and the nature of the funds she received from Decedent's bank account.

Following the close of proof, the trial court referred the case to mediation. While mediation continued, both Appellant and the Estate filed a joint motion asking the trial court to determine whether the bank account in question was owned jointly or individually. In an order entered on March 2, 2018, the trial court ruled that the account was individually owned by Decedent. Mediation efforts eventually failed.

On August 30, 2018, the trial court issued its oral ruling, finding that Appellant had unduly influenced Decedent, breached her fiduciary duty, and converted Decedent's funds for her own use. The trial court found that the undue influence of Decedent was not established via direct evidence but was instead established by suspicious circumstances that were not rebutted by Appellant through clear and convincing evidence. After a subsequent hearing regarding compensatory damages, punitive damages, and the Administrator's Fees, the trial court entered a comprehensive Order and Memorandum Opinion regarding the Administrator's Complaint. In the Order, the trial court held that

Appellant was liable for undue influence, breach of fiduciary duty, and conversion. The trial court did not find Appellant committed fraud, and the trial court ruled it did not have jurisdiction to decide the exploitation issue under the state's Adult Protection Act. The trial court therefore awarded the Estate $2,285,078.20 in compensatory damages against Appellant but declined to award punitive damages. An award of the Administrator's attorney's fees was also deemed appropriate, and a later hearing set the final fee amount at $210,755.00.[4] The injunction prohibiting Appellant from using assets that were part of the Estate remained in effect. Appellant timely filed a notice of appeal.

## II. ISSUES PRESENTED

Appellant raises four issues on appeal. We slightly restate them as follows:

1. Whether the trial court erred in concluding that Decedent's checking account was an individual account rather than a joint account with a right of survivorship?
2. Whether the trial court erred in concluding that Appellant exercised undue influence over Decedent?
3. Whether the trial court erred in concluding that Appellant breached a fiduciary duty to Decedent?
4. Whether the trial court erred in concluding that Appellant converted Decedent's funds to her own use?

## III. STANDARD OF REVIEW

This matter was resolved following a bench trial. After a bench trial, a trial court's findings of fact are reviewed "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). A trial court's conclusions of law are entitled to no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008) (citing *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744–45 (Tenn. 2002)). On appeal, great weight is given to "the trial court's factual findings that are determined on credibility." *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005) (citing *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997)).

## IV. DISCUSSION

**Classification of Bank Account**

The trial court ruled that undue influence, breach of fiduciary duty, and conversion each occurred based on Appellant's use of a single bank account titled in Decedent's

---

[4] In sum, the total award of damages plus attorney's fees against Appellant was $2,495,833.20.

name, account ending -3289. Through an order filed after the close of proof, the trial court found that the bank account was an individual account held solely by the Decedent. On appeal, Appellant argues that she and Decedent jointly owned the bank account and that she was entitled to all funds she withdrew from the account as a joint owner. The Estate argues that the account was individually held by Decedent and that Appellant withdrew any funds from that account as Decedent's attorney-in-fact. We choose to address this issue first.

Multiple-party deposit accounts are governed by Tennessee Code Annotated section 45-2-703. The statute defines a multiple-party deposit account as "a deposit account, including a certificate of deposit, established in the names of, payable to, or in form subject to withdrawal by two (2) or more natural persons . . . ." Tenn. Code Ann. § 45-2-703(c). The Estate does not dispute that account ending in -3289 constitutes a multi-party deposit account because it, at the least, was "subject to withdrawal by two (2) or more natural persons." The Estate contends that while the -3289 account meets the broad definition of a multi-party deposit account, Appellant has no ownership interest in the account or survivorship right. Section 45-2-703 does state that a multi-party deposit account can take many forms. Thus, the statute requires that banks

> utilize account documents that enable the depositor to designate ownership interest therein in terms substantially similar to the following:
>
> > (A) Joint tenants with right of survivorship;
> > (B) Additional authorized signatory; and
> > (C) Other deposit designations that may be acceptable to the bank.

Tenn. Code Ann. § 45-2-703(d)(1). Consequently, the statute contemplates that not all multi-party deposit accounts entail survivorship rights; instead, some accounts become multi-party accounts simply through the addition of an additional authorized signatory. This distinction is important because when a multiple-party deposit account is designated as an account with joint tenants with rights of survivorship, account owners possess joint ownership of all account funds and are entitled to sole ownership of those funds upon the death of the other account owners. Tenn. Code Ann. § 45-2-703(f)(1). In contrast, when a multiple-party deposit account has an additional authorized signatory, "the person named as additional authorized signatory shall have authority during the lifetime of one (1) or more owners to withdraw moneys from the deposit account or represented by the certificate of deposit." Tenn. Code Ann. § 45-2-703(f)(2). An authorized signatory does not have ownership rights in the account and cannot receive funds upon the death of the account owner. *Id.*

Unfortunately, the documents utilized by the Bank in this case do not contain any express designation by Decedent or any one specific document that designates that the account at issue takes either of the above forms. Again, however, the statute contemplates

such a situation. Under the statute, account owners can indicate their intent of ownership interest through various account documents, including a signature card, a deposit agreement, or "[o]ther documents provided by the bank or deposit institution that indicate the intent of the depositor." Tenn. Code Ann § 45-2-703(d)(2).

At trial and on appeal, Appellant's argument relies heavily on *Guess v. Finley*, No. E2011-00947-COA-R3-CV, 2012 WL 1302779 (Tenn. Ct. App. Apr. 16, 2012), and *Estate of True v. Padgett*, No. 2005-01584-COA-R3-CV, 2006 WL 2818239 (Tenn. Ct. App. Oct. 3, 2006). In *Guess*, multiple-party deposit accounts were formed by a man and his niece. 2012 WL 1302779, at *1. The bank listed both parties' names on the accounts, and both parties signed a "Personal Account Signature Card" establishing the accounts. *Id.* at *1–2. The account owners were subject to the bank's rules and regulations, which stated that a joint account would operate by default as a joint account with survivorship. *Id.* at *7. This Court held that, under state statute, the designation of the joint account as one with survivorship provided conclusive evidence about account status and the intent of the parties when they opened the account. *Id.* at *10–11. In *Estate of True*, a woman added two friends as owners to an individual account while she was in a nursing home. 2006 WL 2818239, at *1. All three people signed a signature card that bound them to the bank's rules and regulations. The original owner of the account was advised orally that the accounts would be jointly owned and that the two new owners would have a right to the account funds upon her death. *Id.* at *3. This Court held that the account was classified as a joint account with rights of survivorship and that the terms of the rules and regulations, as known by the account holders, conclusively established the intent of the parties to treat the account as having survivorship rights. *Id.* at *6.

Appellant contends that *Guess* is controlling in this case because the present situation involves the same bank and, therefore, the same rules and regulations. The rules and regulations applicable to account ending -3289 indeed state that "[the Bank] will treat all Joint Accounts, unless otherwise indicated on the Bank's records, as 'joint tenants with right of survivorship' for all purposes. . . ." The Estate argues, however, that *Guess* does not apply in the present case, as the Bank's records indicate that the Decedent's account was not treated as a joint account and that Appellant was added only as an additional authorized signatory.

After a thorough review of the record, we agree with both the Estate and the trial court. Importantly, the parties in *Guess* did not dispute that the account at issue was a joint account. Indeed, the *Guess* opinion makes clear that the accounts at issue were titled in the names of both the uncle and the niece. *Guess*, 2012 WL 1302779, at *1 ("Both accounts were titled in the names of [uncle and niece]."). Because the Bank's rules and regulations provided that a joint account would be treated as a joint account with survivorship, the Court held that the bank records conclusively showed that the niece was entitled to rights of survivorship. *Id.* at *10–11; *see also Estate of True*, 2006 WL

2818239, at *1 (quoting the bank's regulation as follows: "We will treat all Joint Accounts as 'joint tenants with right of survivorship' for all purposes[.]'").

The records in this case indicate, however, that when Appellant was added to the -3289 account, a joint account was not created. Rather, the other type of account expressly authorized under section 45-2-703 was created: a multi-party account with an additional authorized signatory. Tenn. Code Ann. § 45-2-703(d)(1)(B). To reach this result, we look to "any" of the documents outlined in section 45-2-703(d)(2). *See* Tenn. Code Ann. § 45-2-703(d)(2) (explained *supra*). As an initial matter, we note that the Bank's rules and regulations make a distinction between "an Owner of an Account" and a "signer named on your signature card." Indeed, the Rules and Regulations specifically state that the Bank "may accept an individual as an additional authorized signer or signatory on an Account and consider this individual an agent for the owner and not as an owner of the Account." As such, the regulations certainly do not require that we treat every person named on a signature card as an owner of an account, or that we treat all accounts that contain multiple signatories as joint accounts.

The signature card itself is particularly telling in this case. *See* Tenn. Code Ann. 45-2-703(d)(2)(A). First, unlike the same document in *Guess*, the signature card here indicates that the account is titled solely in Decedent's name. *Guess*, 2012 WL 1302779, at *1.[5] Decedent attempted to sign her name on the form multiple times with no title or designation; Appellant, however, signed her name as "POA" for Decedent in the authorized signatories section of the paperwork. Importantly, neither *Guess* nor *Estate of True* involved the survivor signing the signature card with any designation that suggested merely an agency-type relationship. *See Guess*, 2012 WL 1302779, at *1 (noting that even though the survivor was named as the decedent's power of attorney, the signature card was not signed with any "POA" designation and the survivor's name was added to the account's title); *Estate of True*, 2006 WL 2818239, at *1 (including no indication that the survivor was the attorney-in-fact of the decedent). Clearly, however, this express designation indicates that Appellant was signing the signatory card as the agent for Decedent, rather than on her on behalf.

The Bank's regulations contain specific provisions relative to "Signature Authorities." Within this portion of the Bank's Rules and Regulations are rules specifically related to agency relationships and powers of attorney. The regulations outline the process for the bank to accept a power of attorney outside of the bank, including the possibility of requiring an attorney-in-fact "to confirm in an affidavit that the power has not been revoked or terminated or that [the attorney-in-fact is] not deceased." Here, the Bank required that Appellant sign a separate, bank-issued affidavit of attorney-in-fact when altering the bank account. Nothing in the Rules and Regulations indicate that an individual who is added to an account as an attorney-in-fact somehow

---

[5] The *Guess* signature card was also submitted as an exhibit at trial.

becomes an owner of the account; rather, when read as a whole, the Rules and Regulations make clear that the attorney-in-fact is merely the agent of the owner and not a joint owner of the account. *Cf. **Maggart v. Almany Realtors, Inc.***, 259 S.W.3d 700, 705 (Tenn. 2008) ("[W]e cannot read portions of a contract in isolation-they must be read together to give meaning to the document as a whole."). And again, neither of the surviving owners in Appellant's cited cases signed an affidavit of attorney-in-fact. *See **Guess***, 2012 WL 1302779, at *1; ***Estate of True***, 2006 WL 2818239, at *1.

Finally, the actions of the parties with respect to the account confirm that the account was not treated or intended as a joint account. It is noteworthy that the evidence in this case establishes that an impetus for adding Appellant to this account was Decedent's inability to sign checks on her own behalf. Indeed, the evidence presented at trial indicated that Decedent even had difficulty signing the signatory card to make her desired change to the -3289 account. No similar evidence was presented in ***Guess*** or ***Estate of True*** that the change in the account was a result of the original account's holder's declining ability to sign checks on his or her own behalf. ***Guess***, 2012 WL 1302779, at *1. ***Estate of True***, 2006 WL 2818239 at *1. Even more importantly, when Appellant signed checks from the -3289 account on Decedent's behalf, she consistently did so as "POA" for Decedent, not as an owner of the account. The joint owner in ***Estate of True*** wrote checks out of the disputed account without including such a designation. *See **Estate of True***, 2006 WL 2818239, at *2–3 (noting that the depositor wrote checks to pay expenses after the other account owner's death). Both the affidavit of attorney-in-fact, discussed *supra*, and the "POA" designation would have been entirely unnecessary if Appellant had truly been a joint owner of a joint account with Decedent. In practice, the Bank treated the account as if Decedent owned it individually, as her name was the only one listed as an account owner on the signature card and on the checks that Appellant signed as attorney-in-fact.

Based on the foregoing, we conclude that the documents in the record establish Decedent's intent under section 45-2-703 not to establish a joint account but to name Appellant as an authorized signatory on Decedent's individual account. The trial court therefore did not err in ruling that this account did not pass to Appellant through survivorship. *See* Tenn. Code Ann. § 45-2-703(f)(2). Therefore, Appellant acted in her capacity of attorney-in-fact during the transactions in question, and these transactions can be examined for undue influence, breach of fiduciary duty, and conversion.[6]

---

[6] Even if, *arguendo*, the account in question was considered a joint account, we note that joint accounts are only "generally immune from attack in the absence of fraud, misrepresentation, duress, undue influence, mutual mistake, and incapacity." ***Lowry v. Lowry***, 541 S.W.2d 128, 133 (Tenn. 1976). Therefore, "where there is some evidence of fraud or undue influence, . . . there is no conclusive evidence as to the validity of the joint account and a party can challenge the validity of the transfer." ***Powell v. Moore***, No. W1998-00001-COA-R3-CV, 2000 WL 286729, at *3 (Tenn. Ct. App. Feb. 17, 2000). The classification of the bank account in question would not prevent this Court from determining whether undue influence existed in the creation of the bank account and whether the transfers in question were

**Undue Influence**

We next consider whether the trial court erred in finding that Decedent was a victim of undue influence with regard to the withdrawals from the -3289 account. As an initial matter, we note that on appeal, Appellant does not point to specific transactions that she argues were not the product of undue influence; rather, Appellant makes a global argument that the trial court's undue influence finding was incorrect as to all of the -3289 account transactions, which the trial court invalidated as a whole. Because Appellant has not chosen to single-out any specific transaction, we will not tax the length of this opinion by consideration of individual transactions. Instead, we follow Appellant's example to consider whether the circumstances as a whole establish undue influence sufficient to support the trial court's findings.

Undue influence can occur when a confidential relationship places one party in the capacity to exert control over the mind and will of another person. *Fritts v. Abbott*, 938 S.W.2d 420 (Tenn. Ct. App. 1996) (citing *Bright v. Bright*, 729 S.W.2d 106 (Tenn. Ct. App. 1986)). Undue influence can be established through two avenues: direct evidence of undue influence, or the existence of suspicious circumstances that leads to a conclusion that the allegedly influenced person did not act freely and independently. *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989) (citations omitted). "While undue influence may be proved either by direct or circumstantial evidence, direct evidence of undue influence is rarely available." *In re Estate of Maddox*, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001).

When dealing with suspicious circumstances, "[t]he *existence* of a confidential or fiduciary relationship, together with a transaction by which the dominant party obtains a benefit from the other party, gives rise to a presumption of undue influence that may be rebutted." *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995) (emphasis in original). As this Court has explained:

> "Under Tennessee law, as in most jurisdictions, a presumption of undue influence arises where the dominant party in a confidential relationship receives a benefit from the other party." *In re Estate of Hamilton*, 67 S.W.3d 786, 793 (Tenn. Ct. App. 2001) (citing *Matlock*, [902 S.W.2d at 386]; *Crain v. Brown*, 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991)). "[A] confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress* [*v. Currie*], 74 S.W.3d [324, 328–29 (Tenn. 2002)] (citing *Matlock*, 902 S.W.2d at 386); *see also In re Estate of Hamilton*, 67 S.W.3d at 793; *Mitchell* 779 S.W.2d at 388, 779 S.W.2d at 389 ("A person authorized to

---

valid.

act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship with the person who executed the power of attorney."). No confidential relationship arises when an unrestricted power of attorney is executed but has not yet been exercised. *Childress*, 74 S.W.3d at 329. A power of attorney is restricted and a confidential relationship does not exist as a matter of law when the power of attorney never came into effect and the person granting the power of attorney may alter or revoke it at any time. *McKinley v. Holt*, No. 03A01–9807–PB–00220, 1999 WL 233400, at *4, 1999 Tenn. App. LEXIS 247, at *12 (Tenn. Ct. App. Apr. 15, 1999); *see also Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002).

Once a presumption of undue influence arises, in order to overcome the presumption, the dominant party must establish that the transaction at issue was fair by clear and convincing evidence. *In re Estate of Hamilton*, 67 S.W.3d at 793. With a will contest, evidence that the testator received independent, legal advice concerning the contents of a will may rebut this presumption. *Id.* (citing *Crain*, 823 S.W.2d at 194). Finally, we are mindful that "the presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979) (citing *Williams v. Jones*, 54 Tenn. App. 189, 388 S.W.2d 665 (1963); *Roberts v. Chase*, 25 Tenn. App. 636, 166 S.W.2d 641 (1942)).

*Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. 2005).

While Appellant acknowledged that a confidential relationship existed between her and Decedent, she argues that the presumption of undue influence should not attach because she was not the "dominant party" in the relationship. Through witness testimony, Appellant contends that Decedent was a strong-willed person and not manipulated by Decedent despite the transactions that occurred through Appellant's role as attorney-in-fact. According to Appellant, no dominion over the Decedent occurred, and each transaction was the will of the Decedent. The Estate, however, argues that Appellant's use of the Power of Attorney to direct money is enough to establish both a confidential relationship and suspicious circumstances of undue influence. We agree.

This Court has repeatedly held that "an unrestricted power of attorney, in and of itself, creates a confidential relationship between the parties." *Matlock*, 902 S.W.2d at 386; *see also Childress*, 74 S.W.3d at 328–29. Further, the "holder of the power[,]" i.e., the individual to whom the power of attorney is granted, is characterized as the dominant

party in the relationship. ***Dickson v. Long***, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *9 (Tenn. Ct. App. Apr. 8, 2009) (stating that the individual who holds the power, rather than "the grantor of the power[,]" is the dominant party for purposes of the confidential relationship analysis); *see also* ***Taylor v. Taylor***, No. M2008-00565-R3-CV, 2008 WL 1850807, at *3 (Tenn. Ct. App. Apr. 24, 2008), *perm. app. denied* (Tenn. 2008) (stating that the holder of a power of attorney in a breach of fiduciary duty case serves as the dominant party in a fiduciary relationship). In the present case, Decedent issued a general durable power of attorney in favor of Appellant. With that Power of Attorney, Appellant obtained the authority to act as an authorized signatory for Decedent's bank account. Appellant used her authority to write checks payable to herself with a combined value of more than $2,000,000.00. By using her authority as attorney-in-fact to obtain financial resources, Appellant completed dozens of transactions where she, as a dominant party, obtained a benefit from Decedent, the subservient party. *See* ***Matlock***, 902 S.W.2d at 385. Given the nature of the transactions and Appellant's role as attorney-in-fact, we determine that the trial court did not err in finding (1) that a confidential relationship existed between Appellant and Decedent; (2) that Appellant was the dominant party in the relationship; (3) that Appellant received a benefit from Decedent, and finally (4) that a presumption of undue influence was created based on these circumstances.

Once a prima facie case of undue influence was established, the burden of proof shifted to Appellant to prove by clear and convincing evidence that the transactions were fair. *See, e.g.,* ***Matlock***, 902 S.W.2d at 386 (citations omitted); ***Childress***, 74 S.W.3d at 328. As we have previously stated:

> The Tennessee Supreme Court has defined "clear and convincing" evidence as more exacting than the preponderance of the evidence standard but not requiring such certainty as beyond a reasonable doubt. ***Hughes v. Bd. of Prof'l. Responsibility. of Sup. Ct. of Tenn.***, 259 S.W.3d 631, 641 (Tenn. 2008) (quoting ***O'Daniel v. Messier***, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995)). "Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established." ***O'Daniel***, 905 S.W.2d at 188 (citations omitted).

***In re Estate of Murdaugh***, No. W2011-00041-COA-R3-CV, 2011 WL 6141067, at *5 (Tenn. Ct. App. Dec. 8, 2011). Establishing the fairness of a transaction can vary in difficulty "depending on the circumstances of a particular case and the strength of the presumption of undue influence." *Id.* at *3 (citing ***Richmond v. Christian***, 555 S.W.2d 105, 108 (Tenn. 1977)). The presumption can also be rebutted through a lack of suspicious circumstances. ***Parish v. Kemp***, 308 S.W.3d 884, 891 (Tenn. Ct. App. 2008) (citing ***Simmons v. Foster***, 622 S.W.2d 838, 841 (Tenn. Ct .App. 1981)).

While courts require evidence of independent advice only when the fairness of the transaction would be difficult to prove otherwise, that requirement typically arises when the transaction in question is a gift from a "feeble or incompetent subservient party to the dominant party, and the gift leaves the donor impoverished." *Fell*, 36 S.W.3d at 837. When the gift does not leave the subservient party impoverished, we have not held that the absence of independent advice prevented the dominant party from rebutting the presumption of undue influence. *Id.* When independent advice is not required,

> [p]roof of "fairness" can [] be shown by other means. The scope of evidence relevant to the fairness of a transaction or gift is quite broad. *In re Estate of Bean*, No. M2003-02029-COA-R3-CV, 2005 WL 3262936, at *11 (Tenn. Ct. App. Dec. 1, 2005); *In re Estate of Park*, No. M2003-00604-COA-R3-CV, 2005 WL 3059443, at *9 (Tenn. Ct. App. Nov. 14, 2005); *In re Estate of Maddox*, 60 S.W.3d at 89. "The nature of proof of fairness necessary to overcome the presumption of undue influence is, of course, largely dependent on the particular facts of the case at issue." *Taylor v. Taylor*, No. M2007-00565-COA-R3-CV, 2008 WL 1850807, at *4 (Tenn. Ct. App. Apr. 24, 2008) *perm. app. denied* (Tenn. Oct. 27, 2008).

*Thompson v. Thompson*, No. W2008-00489-R3-COA-CV, 2009 WL 637289, at *11 (Tenn. Ct. App. Mar. 12, 2009). In analyzing this issue, we have previously considered whether the transactions at issue were consistent with other indications of intent left by the decedent, such as a will. For example, in *McMillin v. McMillin*, a son withdrew $615,000.00 of his mother's money to ostensibly build a new house for her, but did not present evidence as to the use of nearly half the funds, which undisputedly did not go toward construction costs. *McMillin v. McMillin*, No. E2014-00497-COA-R3-CV, 2015 WL 1510766, at *6 (Tenn. Ct. App. Mar. 31, 2015). While the son testified that the funds were used to pay his mother's expenses, he did not dispute that his mother's will showed her intent to distribute her estate equally among her children. *Id.* This Court affirmed a jury verdict of undue influence against the son and further stated that "Decedent's will evinced a clear and unambiguous intent by her that her children share equally in her estate." *Id.*

Because a lack of suspicious circumstances can be used to rebut the presumption of undue influence, *see* *Parish*, 308 S.W.3d at 891, the following considerations establishing suspicious circumstances are also relevant to this analysis: (1) the decedent's advanced age and/or physical or mental deterioration; (2) the dominant party's active involvement in the transactions at issue; (3) secrecy concerning the transaction's existence; (4) the lack of independent advice; (4) the decedent's illiteracy or blindness; (5) the unjust or unnatural nature of the transaction; (6) the decedent being in an emotionally distraught state; (7) discrepancies between the transaction and the decedent's expressed intentions; and (8) fraud or duress directed toward the decedent. *In re Estate of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578, at *14 (Tenn. Ct. App.

- 14 -

Aug. 7, 2002) (involving a claim of undue influence in procuring a will) (citing **Mitchell v. Smith**, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989)). No mathematical formula exists, however, for determining the number and type of suspicious circumstances that will support a finding of undue influence. **Mitchell**, 779 S.W.2d at 388.

Here, Appellant argues that transactions between her and Decedent were fundamentally fair, that Decedent was qualified and capable of handling the transactions, and that independent advice was not necessary for these transactions. Appellant points out that independent advice is not required to rebut the presumption of undue influence because Decedent's alleged gifts, while significant, did not leave her impoverished.[7] *See Fell*, 36 S.W.3d at 837. Nevertheless, we are not convinced that the evidence provided is clear and convincing enough to meet Appellant's burden to rebut the presumption of undue influence. In her brief, Appellant references the highly personal nature of her relationship with Decedent and testimony that showed how Decedent's life had improved after Appellant moved in with her full-time. Appellant also argues that Decedent was highly educated and remained mentally capable until the end of her life. Gifts from Decedent to Appellant, even of the amount in question, would be "quite natural" given the nature of their relationship, Appellant contends.

As an initial matter, we must discuss the state of Appellant's brief on this issue. Pursuant to Rule 27 of the Tennessee Rules of Appellate Procedure, arguments must be supported by both appropriate references to the appellate record and citations to relevant authorities. *See* Tenn. R. App. P. 27(a)(7). While this section of Appellant's brief is rife with references to the appellate record to support her factual contentions, this portion of her brief contains only a single, conclusory citation to any legal authority. Specifically, Appellant's brief extolls on the proof provided of Appellant's care of Decedent, then asks the following: "Under these circumstances, who better and more naturally to extend her largess upon than upon Appellant []? *DeLapp v. Pratt*, supra."

Respectfully, Appellant's conclusory citation of **DeLapp** does not comply with the letter or the spirit of Rule 27. The Tennessee Supreme Court has made abundantly clear that courts have no duty "to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." **Sneed v. Bd. of Prof'l Responsibility of Supreme Court**, 301 S.W.3d 603, 615 (Tenn. 2010). As such, this court is under no obligation to scour the **DeLapp v. Pratt** opinion to determine how it could benefit Appellant's argument on this issue. Indeed, even a cursory review of **DeLapp** indicates that this Court affirmed the jury's finding that the presumption of undue influence was not sufficiently rebutted by the defendant. 152 S.W.3d 530, 540–41 (Tenn.

---

[7] Even without the transactions at issue in this appeal, Decedent's estate was worth more than $2,000,000.00 at the time of trial.

Ct. App. 2004). As such, it is entirely unclear what benefit Appellant hopes to gain by her citation of **DeLapp**.

Despite Appellant's deficient briefing on this issue, we will proceed to consider whether Appellant rebutted the presumption of undue influence at trial. To be sure, Appellant has pointed to some evidence in her favor. For example, there is no dispute that Appellant served as Decedent's full-time caretaker. Indeed, evidence was presented that Decedent's condition improved after Appellant's involvement. There is also no dispute that Appellant and Decedent maintained a close and loving relationship until Decedent's death. Some of the previously recognized suspicious circumstances were also not present in this case. *See* **Parish**, 308 S.W.3d at 891 (stating that a lack of suspicious circumstances can be used to rebut the presumption of undue influence). For example, Decedent was neither blind nor illiterate; indeed, she was a respected medical doctor prior to her retirement.

Other circumstances, however, weigh heavily against any effort by Appellant to rebut the presumption of undue influence. Indeed, the trial court specifically found forty-four suspicious circumstances that were present in this case. These suspicious circumstances ranged from the checks that Appellant wrote that were payable to herself to Decedent's health and memory struggles during the span of the Power of Attorney, Decedent's shrinking role in managing her finances, and the outsized role that Appellant possessed in managing Decedent's day-to-day life. Appellant did not specifically address these suspicious circumstances in her brief. We agree that many of the relevant circumstances do not favor Appellant in this case. For example, at the time of the transactions at issue, Decedent was of advanced age. *See* **Mitchell**, 779 S.W.2d at 388. The testimony showed that both her physical and mental health were declining at that time. *Id.* Indeed, Decedent was unable to properly sign the signature card to add Decedent as an authorized signatory on her -3289 account as early as June 2012. Although neighbors testified that Decedent appeared to be in fair health until shortly before her death, these neighbors offered no testimony as to whether Decedent authorized the transactions at issue independent of any undue influence by Appellant. As in **McMillin**, Appellant did not provide evidence about the fairness of the transaction beyond her own testimony. *See* **McMillin**, 2015 WL 1510766, at *6.

Rather, the bulk of Appellant's argument on this issue is that the gifts given to Appellant following the execution of the Power of Attorney were in keeping with Decedent's prior history of giving large gifts to Appellant and to others. There is no dispute that Decedent wrote a check to Appellant in November 2011 for $320,000.00. This check was characterized as a birthday gift. After a police investigation, it was concluded that Decedent signed the check of her own free will. That check is not disputed on appeal. Moreover, there is also no dispute that Decedent supported her prior live-in

companion during her illness. Appellant contends that these payments illustrate Decedent's generous nature and her practice of giving large gifts. Respectfully, we cannot agree.

Here, Appellant received one, admittedly large, birthday gift from Decedent in 2011. No similar birthday check was written in 2012. The frequency of checks increased dramatically after Appellant was authorized to write checks from Decedent's account. In fact, Appellant wrote herself two large checks as birthday gifts in the span of a few months: a $300,000.00 check in September 2013 and a $400,000.00 check in February 2014. Decedent offered no explanation for why birthday gifts were given more than once in an approximately six-month period. Moreover, this constitutes a more than 100% increase on the amount of birthday giving that Appellant had enjoyed in the prior two years. Importantly, the gifts and payments substantially increased in frequency the closer that Decedent came to her death. Indeed, the final large check was written only days before Decedent's death. Evidence was presented that, during this time, Decedent's mental faculties were heavily impaired. Moreover, while the evidence shows that Decedent did support her prior companion through a prolonged illness, the evidence shows that it was Decedent who was ill, rather than Appellant.

Further, Decedent provided a view into her intent through her 2011 will, which would give Appellant 7.5% of Decedent's estate. Similar to when a will is contrary to a decedent's stated intentions, *see Mitchell*, 779 S.W.2d at 388, we see no reason not to consider whether the transactions at issue were contrary to the decedent's intent as expressed through her will. *McMillin*, 2015 WL 1510766, at *6. Through her will, Decedent had provided one-half of her estate to be given to various charitable organizations. The other half would be distributed to nearly three dozen named individuals based on the percentages she allocated. If Decedent desired to change her will to further benefit Appellant, she had every right to do so before she died, barring, of course, undue influence by a recipient. While Decedent was known to occasionally provide large gifts, particularly to her live-in companions, the complexity of her estate planning indicates her desire for her wealth to be distributed in small portions to several parties upon her death. As in *McMillin*, Decedent provided a roadmap for her wealth to be distributed that she did not amend in the later years of her life. *Id.* While documents not admitted to probate attempted to give pieces of real estate and personal property to Appellant, Decedent's intent to distribute her wealth was not altered.[8]

In sum, Appellant's actions, including writing more than $2,000,000.00 worth of checks as attorney-in-fact payable to herself, are inconsistent with the intent of Decedent's will and the notion that these transactions were fair and freely approved by Decedent. Given the lack of clear and convincing evidence rebutting the presumption, we

---

[8] The trial court rejected Appellant's efforts to admit these purported codicils. That ruling was not raised as part of this appeal.

conclude that the trial court did not err in determining that a presumption of undue influence existed in the present case and that Appellant failed to rebut that presumption. As the Estate noted in oral argument, a finding of liability in one cause of action is dispositive of the remaining causes of action. Therefore, we pretermit consideration of the issues of breach of fiduciary duty and conversion.

## V. CONCLUSION

The judgment of the Shelby County Probate Court is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Carnita F. Atwater, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE